Mary C. Flournoy and Husband vs. Alonzo Flournoy.

. No. 758.

MARY C. FLOURNOY AND HUSBAND VS. ALONZO FLOURNOY, EXECUTOR, AND
OTHERS.

The heirs of a succession which has not been opened, and which is composed en-
tirely of claims against another succession under administration in a parish
court, sue the executor and heirs of the latter succession, (of which they are co-
heirs,) for a partition and settlement of both successions, and to compel each
heir of the latter succession to collate $5000.
HELD—That the claim for collation is virtually a demand for a money judgment,
and being for more than $500, the parish court has not jurisdiction.
If the surviving husband did not open his wife's succession, of which he enjoyed
the usufruct, the assets of her succession may be distributed by the probate
court, in the administration of the husband's succession, when his heirs are her
heirs, and the heirs of the one, set up no demand against the heirs of the other
succession, involving more than $500.
An exception to the jurisdiction of a court should not be referred to the merits, but
passed on at once.

A PPEAL from the Parish Court of Caddo parish. *Cresswell*, J.

*Land & Taylor*, for plaintiff and appellant.

*Duncan & Moncure*, for executor and appellee.

*A. W. O. Hicks*, for J. C. Yerger, defendant and appellant.

The opinion of the court was delivered by

MARR, J. Dr. Alfred Flournoy, residing in the State of Tennessee,
married Martha Moore, who died, leaving six children, of whom three,
Alonzo, James, and Alfred are living, and William, Rachel, and Martha
are dead. William and Rachel left a number of children, some of them
minors; and Martha, who married Cain, left one child that survived her
but a few months.

In 1836 Dr. Flournoy contracted a second marriage with Maria, widow
of Yerger, who had one child, John C. Yerger, who is still living.

At the time of the marriage Dr. Flournoy owned from thirty to thirty-
five slaves, and was considered a wealthy farmer in Tennessee; and
Maria Yerger owned some slaves, nine or ten, as some of the witnesses
say, twelve or fourteen according to others; and other personal property
of no great value; all of which Dr. Flournoy reduced into possession.

In 1837 Dr. Flournoy visited Louisiana in search of a new home,
"prospecting," as the witnesses say. He found lands that suited him in
Caddo parish, government lands occupied by settlers, or "squatters," to
whom he paid $2500, for their improvements and claims.

Early in 1838, with two of his sons, he left Tennessee, for Louisiana,
leaving the remainder of the family in Tennessee. He brought with him
the greater part of his slaves, as well those which belonged to him
before as those which belonged to Maria Yerger at the time of the mar-

47

riage; also, a supply of corn and meat, mules, horses, and farming implements; laden on flatboats, which, at an expense of $1400, he had towed to Shreveport. Proceeding thence, he reached his destination on the thirteenth of March, 1838; and established himself on the lands for which he had paid the occupants when he visited Louisiana in 1837.

In the fall of 1838, the family moved from Tennessee, and continued to live on this property. In 1839 Dr. Flournoy entered the lands, at government price, $1 25 per acre.

Mrs. Flournoy died in February, 1848, leaving four children, issue of her marriage with Dr. Flournoy, Mary Camp, Pattie, David, and Charles Flournoy. David died several years after his mother; and Mary Camp, now wife of S. H. Sibley, Pattie, wife of S. B. Surrat, and Charles Flournoy are still living.

When Dr. Flournoy removed to Louisiana, the law of Louisiana began to operate upon him, his rights, and his property within the limits of the State; and a community of acquets and gains between him and his wife ensued by mere effect of law, dating from the removal to Louisiana. As Mrs. Flournoy died intestate, her share of the community was inherited by her children, in equal parts, that is, by the four Flournoy children and by John C. Yerger.

By the act of 1844, in force at the death of Mrs. Flournoy, and now, Dr. Flournoy was entitled to the usufruct, for life or during widowhood, of that portion of the community which was inherited by the issue of the marriage. That is, four fifths; the other fifth being inherited by John C. Yerger, whose title and right of possession and enjoyment accrued and took effect immediately upon the death of his mother.

Dr. Flournoy took no steps to administer the succession of his wife. He assumed and acted upon the hypothesis that his four children were the only heirs of their mother; and these children have acted upon that assumption, and have claimed and held adversely, and without regard to any right or title of Yerger.

To avoid errors in future, with regard to this property, it may be well to state here what were the rights of Dr. Flournoy and his wife Maria, at the moment the laws of Louisiana began to operate on them. It has been suggested in argument that we must presume that the law of Tennessee was like our own, in 1836, when the marriage between these parties took place. But we know that it was not; and, while we can not be expected to know, and do not profess to know the details and particulars of the special statutes of any other State than our own, we can not pretend to be ignorant of the general laws of the several States, regulating marriage, descent, and the transmission or acquisition of property. As a matter of legal history, we know that, in 1836, slaves were personal property in Tennessee; that community did not exist between husband

and wife; and that the slaves and other personal property belonging to a woman became the absolute property of her husband when reduced into possession by him after the marriage.

When Dr. Flournoy arrived in Louisiana with these slaves, they fell under the dominion of the laws of Louisiana, in the exact condition in which they were on arriving here; and being then the property of Dr. Flournoy they continued to be his property. They never entered into the community. Mrs. Flournoy had no property in them; and the results of their labor alone belonged to the community. The community consisted of the profits, gains, realized from the removal to Louisiana, in 1838, up to the time of the death of Mrs. Flournoy, in February, 1848; and nothing is counted as profits or gains except such property or effects as remain at the dissolution of the community.

With respect to the land, it may as well be stated that the $2500, paid by Dr. Flournoy to the occupants, and the price paid the government, should properly be charged to the community, and refunded to the succession of Dr. Flournoy, as so much advanced by him out of his own separate means, for account and benefit of the community.

In 1852 Dr. Flournoy qualified as natural tutor of his four minor children, Mary Camp, Pattie, Charles, and David, to whom their maternal grandmother had bequeathed some money and slaves. As tutor, he received this bequest from the executor in Tennessee; and brought the property to Louisiana.

David died a minor, without issue; and Mary Camp and her husband, Sibley, provoked a partition of the slaves and money in the hands of her father and tutor, Dr. Flournoy. She proceeded, and the partition was made, on the hypothesis that she, Pattie, and Charles were alone entitled. The partition was made in December, 1860; and the whole bequest, valued at $8354 50, was divided among the three just named, each receiving one third.

This was wrong. When David died his father was his heir for one fourth; and his brother and sisters of the whole blood, and his brothers and sisters of the half blood, including John C. Yerger, the son of his mother, were his heirs, in unequal portions, according to the dispositions of the Civil Code.

In September, 1858, Dr. Flournoy sold the homestead, the community lands, to Ogilvie for $8400. In 1861 he desired to settle the community; and for that purpose he filed his petition, stating that he had advanced the money with which the lands sold to Ogilvie were purchased and paid for; and he made the necessary prayer to have effected the partition and settlement. But the condition of affairs then existing, and the civil war which ensued, no doubt, prevented further proceedings on this petition.

In August, 1865, the heirs of Maria Flournoy being all of age, Mary Camp Sibley and her husband, Pattie Surrat and her husband, and Charles Flournoy, by notarial act, ratified the sale made by their father to Ogilvie in 1858, and received their shares of the price, $8400, on the hypothesis that they were sole heirs of their mother and entitled to her entire interest in the community; and that her share of the price of the lands was one half, or $4200.

This was wrong again. David and John C. Yerger were equal heirs of their mother with them. Dr. Flournoy was entitled to have refunded to him the $2500 he had paid for the improvements and claims of the squatters; and he was entitled to one fourth of David's share. The remaining three fourths should have been divided between the full brother and sisters of David and his half brothers and sisters, including John C. Yerger, as fixed by the Civil Code.

Dr. Flournoy died in 1873; and his succession consisted of movable effects estimated at $9600 12, and real estate valued at $5700; in all $15,300 12.

In December, 1874, Mary Camp Flournoy and her husband, Samuel H. Sibley, brought this suit in the parish court of Caddo against Alonzo Flournoy, executor of the last will and testament of his father, and the other children and descendants of Dr. Flournoy, as well by his first as by his second marriage, and against John C. Yerger, as one of the heirs of Maria Flournoy. In the petition it is alleged that Dr. Flournoy advanced to each of his children by the first marriage and to Charles five thousand dollars in excess of their portions; and that they are bound to collate. The prayer is for a settlement and partition of the successions of Maria Flournoy and Dr. Alfred Flournoy; and that all the children of the first marriage and Charles Flournoy be ordered to collate the advances made to them by the deceased.

The executor and the heirs thus called upon to collate excepted to the jurisdiction of the court on the grounds substantially:

First—That the succession of Maria Flournoy has not been opened, and is not pending in the parish court of Caddo.

Second—That this suit is, in point of fact, a proceeding to render the succession and heirs of Dr. Alfred Flournoy liable to the succession and heirs of Maria Flournoy for a pecuniary demand.

It is obvious that after the lapse of more than twenty-six years since the death of Mrs. Flournoy, that is from February, 1848, to December, 1874, none of the movable effects or slaves, if there were any, belonging to the community would remain. The usufructuary could not be liable to his children, the heirs and owners, for such of these effects as perished by age, natural decay, or otherwise, without fault on his part. The maxim *res perit domino* applies as well to the property and effects of

the heirs in the hands of the legal usufructuary as to that in the possession of the owner. Time and use would have left no trace of horses and mules or plows and farming implements; and the law with its potent voice struck down slavery and destroyed property in slaves. If there were slaves belonging to the community, that is slaves acquired after the removal of the family to Louisiana, they ceased to exist as property; the usufructuary lost the use and enjoyment; the owners lost the property. Dr. Flournoy would not have been liable, or rather his succession would not have been liable, to his children, heirs of Maria Flournoy, for such effects of the community as perished in the using or ceased to be property by the effect of the law during his usufruct; and as it is manifest that none of these effects remained in kind in his possession at the time of his death, if there is any liability to the heirs of his wife it resolves itself, necessarily, into an obligation to pay money; and the demand of the heirs of the wife is a demand against the succession and heirs of the husband, for a sum of money due the succession of the wife.

The succession of Maria Yerger consists wholly of claims against the succession and heirs of the husband; and the amount of that indebtedness, as alleged in the petition, is far beyond any possible value of the property and effects of the succession of the husband.

Before there can be any tangible succession of Maria Flournoy, any thing to be divided among her heirs, a judgment must be obtained against the executor and heirs of the husband, not merely the children of the first marriage, fixing the amount; because it is not admitted by the executor nor by the heirs that any such indebtedness exists. That only could be recovered which might be proved to be the amount due by the succession and heirs of the husband to the succession and heirs of the wife; and the amount demanded in the petition is far beyond the limited jurisdiction of the parish court.

Where the husband, survivor of the community, dies without having administered the succession of the wife, of which he had the usufruct, his heirs being also the heirs of his wife, the two successions may be settled and distributed among the heirs in his succession alone in the parish court, as was decided in Peniston's case, 22 An. But where one succession, or the heirs of one succession, seek to recover of another succession, or the heirs of another succession, money or property, the suit must be brought in the court having jurisdiction of the amount in controversy, and it can not be in the parish court where the amount or value exceeds five hundred dollars, as was decided in Bynum's case, 24 An.

In this case we have a complication of heirship:

First—The children of the first marriage, entitled to a share in the

succession of Maria Flournoy only in virtue of their inheritance from their half-brother David.

Second—The children of the second marriage, entitled to a share in both successions, as heirs of their father and their mother.

Third—John C. Yerger, entitled to a share in the succession of his mother as one of her heirs, and to a share in both successions as one of the heirs of his half-brother David.*

These conflicting rights and interests can not be settled in the parish court, nor in any single proceeding in the matter of the succession of Dr. Alfred Flournoy; and the parish judge properly declined to entertain jurisdiction.

We observe in this case that the exceptions to the jurisdiction were referred to the merits. We consider this bad practice. When a plea to the jurisdiction is filed, the question should be passed upon and determined by the court at once. It is to be regretted that the parties in this case have incurred the expense and delay of this protracted litigation, to be told at last that the court is without jurisdiction. We should be glad if it were in our power to put an end, by final decree, to this controversy; but we can only affirm the judgment of the court below.

We think it proper to say that all the rights of the parties, whatever they may have been, at the inception of this suit, remain as they were then, wholly unaffected by this decree.

It is therefore ordered, adjudged, and decreed that the judgment of the court below be affirmed with costs.

Mr. Justice Egan, having been of counsel, takes no part in this decision.

Rehearing refused.

---

*This is manifestly a mistake, since David died before his father. The paragraph should have been written thus:

"John C. Yerger, entitled to a share in his mother's succession, as one of her heirs, and to a share as one of the heirs of his half-brother David."

The statement was made *arguendo* to show the complication of the heirship, not to determine the respective rights of the heirs; and this correction, which the context requires, can not affect the conclusion and decree.—R. H. MARR.